## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT

### OF

# NORTH DAKOTA

---

MRS. WILLIAM BOEHM, Plaintiff and Appellant, v. THEODORE K. LONG, Defendant and Appellant, FRED H. MOTSIFF, Intervener and Respondent.

(172 N. W. 862.)

**Specific performance — intervention — construction of statute.**

1. Section 7413, Comp. Laws 1913, which provides that "any person may before the trial intervene in an action or proceeding, who has an interest in the matter in litigation in the success of either party, or an interest against both," applies to an action for specific performance.

**Specific performance — parties who must be joined — parties who may be joined.**

2. All persons who are interested in the enforcement of the contract *must* be, and all those directly and specifically interested in the subject-matter *may* be, joined as parties to a suit for specific performance.

**Specific performance — intervention.**

3. The plaintiff brought the instant action for the specific performance of an alleged contract to purchase real property. Pending such action, the defendant conveyed the premises to the plaintiff. The intervener claimed to have purchased the premises from the defendant, and to be entitled to specific performance of his contract of purchase as against both the plaintiff and defendant. It is *held* that these facts presented a proper case for intervention under § 7413, supra.

43 N. D.—1.

Specific performance — vendor and purchaser — evidence.

4. In the instant case it is *held*, for reasons stated in the opinion, that the intervener had an enforceable contract for the purchase of the premises involved, and that a judgment awarding specific performance thereof is right and should be affirmed.

Opinion filed May 12, 1919.

Appeal from the District Court of Morton County, *Nuessle*, Special Judge.

From a judgment in favor of the intervener, plaintiff and defendant appeal.

Affirmed.

*W. H. Stutsman*, for appellants.

The interest which entitles a person to intervene in a suit between other parties must be in the matter of litigation, and of such a direct and immediate character that the intervener will either gain or lose by the direct legal operation and effect of the judgment. Gasquet v. Johnson, 1 La. 425; Lewis v. Lewis (Minn.) 10 N. W. 586; Horn v. Volcano Water-power Co. 13 Cal. 62.

If the property is seized by virtue of a writ, to which another has a better right, the vindication of such involves a new and independent judicial inquiry.

Re McClellan, 27 S. D. 109, 129 N. W. 1037, Ann. Cas. 1913C, 1029, is a leading case on this proposition, in which the court says: "No rule is better settled or more essential to the rights of parties litigant than that every person is entitled to access to courts of justice without interference from persons who have no interest in the matter in litigation."

That a binding contract may result from an offer and acceptance, it is essential that the minds of the parties meet at every point, and that nothing be left open for future arrangements. An acceptance, to be good, must in every respect meet and correspond with the offer, neither falling within or going beyond the terms proposed. Krum v. Chamberlin (Neb.) 77 N. W. 665.

*Sullivan & Sullivan*, for respondent.

Rev. Codes, § 7413–1913.

A person claiming to be the owner of the property in litigation or of

any interest therein has an interest in the matter in litigation and may intervene. 14 Standard Proc. p. 304; Cunnelle v. Latta, 36 Ark. 304, 111 S. W. 273; Kastner v. Pibilinski, 96 Ind. 229; Orcutt v. Woodard, 136 Iowa, 412, 113 N. W. 848; Rives v. Gulf Ref. Co. 133 La. 178, 62 So. 623; Frederick v. Gehling, 89 Neb. 93, 130 N. W. 968; Sprague v. Bond, 113 N. C. 551, 18 S. E. 701; Dempster v. Baxmeyer, 231 Pa. 38, 79 Atl. 805.

Where the proceedings would cause a cloud over an owner's title he may intervene. Whitman v. Willis, 51 Tex. 426.

Code Civ. Proc. ¶ 50a, providing for intervention before trial, does not affect the power of the court to bring other parties before it when satisfied that their presence is necessary to a proper determination of the cause. Brown v. Brown, 71 Neb. 200, 98 N. W. 718.

This power is also granted to the court under § 7413, Compiled Laws 1913. Dalrymple v. Trust Co. 9 N. D. 306.

A purchaser *pendente lite* is entitled to intervene to protect his interests. 14 Standard Proc. p. 305, and cases therein cited.

The mere fact that the intervener has other remedies which might be availed of does not constitute sufficient grounds for denying an intervention. Taylor v. Bank of Volga, 9 S. D. 572, 70 N. W. 834.

CHRISTIANSON, Ch. J. This is an appeal from a judgment awarding the specific performance of a certain contract for the sale of real property. The judgment was in favor of the intervener, Fred H. Motsiff, and the plaintiff and the defendant appeal, and demand a trial *de novo* in this court.

There is little or no conflict in the evidence. Many of the facts are stipulated. It appears that the defendant, Long, owned a quarter section of land in Morton county in this state. On August 14, 1915, one L. N. Cary, a real estate agent at Mandan, wrote Long to the effect that if he wished to sell the land and would advise him of his wishes "he would be glad to put in an effort." On September 3, 1915, Long replied that the land cost him in all $2,458.11, and that he did not feel disposed to take a loss at that time, and would be pleased to have Cary advise him what he thought it would sell for. To this letter Cary replied that the land ought to sell for $15 per acre. On October 22d, Cary wrote Long that he had received two offers for the land, one for

$15.50 an acre on payments, and another for $15 per acre,—probably cash. Long apparently did not answer these letters, and on November 20th, Cary again wrote, reminding Long of the letter of October 22d. On November 29th, Long wrote Cary in part as follows: "I have felt that to pay for the trouble and annoyance during all these years, plus interest, taxes, cost of tree planting, attorneys' fees and original invest-ment, I should have $3,000. Unless you could get approximately this amount, I would prefer holding a while longer. Would be willing to take a long-time mortgage for say half of the purchase money." In the meantime, L. N. Cary apparently went South, and his office was left in charge of his son, A. A. Cary. On February 12, 1916, A. A. Cary wrote Long as follows: "We now have an offer for your N.W.¼ of 10–138–81, $3,000, $1,500 down, the balance in three annual pay-ments of $500 each with 6 per cent interest. Kindly let us know if your price of $3,000 in your letter of November 29th last contains a commission of $1 an acre to us. We would be glad to hear from you at your early convenience." To this letter Long replied: "My price of $3,000 was net to me. It would not include commission." On March 14, 1916, A. A. Cary again wrote Long as follows: "The appli-cant for your N.W.¼ 10–138–81 has made an earnest payment of $25, check for which we inclose. He will make the payment of $1,500 the first of next month, when we send you the contract to sign. Hoping this will be satisfactory to you, we remain." On March 23, 1916, Long replied: "Your several letters of March 6th and March 14th, with check for $25, reached me during my sojourn in the South, and I hasten to reply. I regret that there has been any misunderstanding about the sale. In addition to having placed the land with your firm for sale I also placed it in the hands of Mr. Robert H. Proudfoot, of Chicago, whose sale, I believe, antedated yours, although it is at a slightly less figure than your client offers. Of course I would rather let you have it, both on account of price and because of the old-time relationship with your father. But under the circumstances I am obliged to return your check herewith." On March 28, 1916, A. A. Cary replied as follows: "I am very much disappointed to receive your letter of the 23d inst. declining to carry out your agreement to sell the N.W.¼ of section 10. Pursuant to your authorization contained in your various letters, we have found a buyer for this land, and entered into a contract with her,

and accepted a down payment to bind the bargain. Of course, we do not care so much about the loss of the commission in this matter, as it is not large, but it is a serious blow to our business reputation to be forced to repudiate contracts entered into with our customers and to be unable to carry them out. The woman to whom this sale was made insists that she has made a binding contract for the purchase of this land, and threatens to take legal steps to enforce her rights."

On the same day this letter was written, *viz.*, March 28, 1916, the plaintiff, Mrs. William Boehm, commenced the present action to enforce specific performance of her alleged contract with Long for purchase of the land. At the same time she filed a notice of *lis pendens*. Plaintiff's right of action, if any, exists by virtue of the correspondence hereinabove set forth. It is stipulated as a fact that on March 31, 1916, plaintiff's attorney of record in this action, and A. A. Cary, were both informed of the contract which the intervener claimed to have with Long for the purchase of the land in controversy.

Long, as stated in his letter of March 23, 1916, had also "placed it (the land) in the hands of Mr. Robert H. Proudfoot of Chicago." And while the foregoing correspondence took place between Long and the Carys, negotiations had also been carried on between Long and Proudfoot, with the result that the intervener, Motsiff, claims to have purchased the land and to be entitled to a decree awarding specific performance of his contract of purchase. It appears that considerable of the negotiations between Long and Proudfoot were carried on over the telephone. However, on January 31, 1916, Long wrote Proudfoot as follows: "Yours of the 19th inst. received. If a sale could be effected of my 160 acres at Mandan within sixty days, I would take $17.50 an acre net to me. *See what you can do with it.*" Later in a telephone communication Long gave Proudfoot the terms of payment. At a subsequent date Long was informed in a similar manner that Proudfoot had sold the land to the intervener, Motsiff, and that the papers, including notice of deposit, would be forwarded to Long by the First National Bank of Mandan. On February 11, 1916, said bank forwarded to Long for his execution a warranty deed for the premises. In the same letter were inclosed notes signed by Motsiff and his wife aggregating $2,300, and a real estate mortgage upon the premises in controversy securing the payment of such notes. In its letter accompanying these papers, the

bank stated: "We also hold the sum of $500, which amount we are to remit to you upon receipt of the above deed properly executed, also abstract of title to aforesaid land, title merchantable and free and clear of encumbrance." The letter further states that $3 in revenue stamps must be attached to the deed, and that if Long had no abstract the bank would obtain one and deduct the cost from the amount held in escrow, if Long would so authorize. On February 21, 1916, Long returned the papers to the bank, stating that the sale was not in accordance with his letters to Proudfoot, and that he had written Proudfoot "fully explaining the situation." On the same day he wrote a letter to Proudfoot, calling attention to the fact that the terms were $17.50 per acre net to him (Long), and that hence the purchaser must pay for the revenue stamps, abstract fee, and other expenses connected with the transfer. On February 24, 1916, Proudfoot wrote Long disclaiming any blame for the error, and further advising him that he was writing to Mandan asking them "to abide the terms" of Long's letter to Proudfoot of January 31, 1916; and that he (Proudfoot) presumed that Long would soon receive the papers, as he desired them. On February 26, 1916, the First National Bank of Mandan returned the warranty deed for execution, together with the notes and mortgage in favor of Long, executed by Motsiff and his wife, heretofore mentioned. In the letter accompanying these papers the bank stated that the items of costs, to the payment of which Long had objected, would be assumed by the purchaser; and that draft for the cash payment on deposit with the bank would be forwarded to Long on receipt of deed, if title was found "o. k." when abstract had been obtained and examined. On March 23, 1916, Long wrote the First National Bank of Mandan, as follows: "Replying to yours of February 26th and telegram of March 13th, both of which reached me during my sojourn in the South, I beg to inclose herewith mortgage for $2,300 and deed, the latter to be delivered to the grantee only on the following conditions, *and for the delivery of which I hereby constitute you my agent;* namely, The mortgage must be entered of record at the cost of the purchaser, and must show on the abstract as the first lien on the land conveyed, and the notes must be changed to include exchange charges. This may be done by having the words 'with exchange charges' added to the notes by makers or by their consent and in their presence. I inclose herewith the notes for the pur-

pose of the change aforesaid. Please see that both makers are present and approve the change. Kindly return notes when corrected; also indicate your purpose to accept the above trust as my agent under the terms proposed herein, and oblige. Do not change date of papers. Note insertion in deed as to taxes to be assumed by grantee."

After the bank received this letter, Motsiff and his wife agreed to the proposed change in the notes, and such change was made. Motsiff had already paid the $500 cash payment into the bank. The bank, however, had become aware of the notice of *lis pendens* which had been filed by the plaintiff and therefore refused to deliver the deed to Motsiff. Motsiff, however, stood on the agreement, refused to accept a return of his money and papers, and on March 31, 1916, instituted an action against Long to enforce specific performance of his contract of purchase.

In the meantime Long had received the letter from Cary of March 28, 1916, and on April 2, 1916, he wrote Cary as follows: "I have just returned from an absence from home of a week in northern Wisconsin and find your favor of the 28th ult. I inclose copy of letter this day forwarded to the First National Bank, of Mandan, which explains itself. I trust the bank has made no delivery of the deed. If it has already delivered the deed, I fear it may be too late for me to help you in the premises. I regret exceedingly that any misunderstanding has resulted." On the same day he wired the bank not to deliver the deed to Motsiff, and also wrote the following letter to the bank: "On March 23d I wrote you, inclosing certain papers and deed to be delivered upon the conditions named in my letter. I have received no acceptance of the conditions named from you. In the meantime notice has been received from Mr. L. N. Cary's office that they, too, have effected a tentative sale of the N.W.¼ of Sec. 10. The land was in the hands of both agencies, and neither one had the exclusive right to sell, and while I maintain that I have a perfect right to pass the papers in your possession, I do not wish to do anything that will in any way involve my old friend L. N. Cary in unpleasant complications with his client. If you have not recorded my deed or made delivery of it, kindly return it to me. I do not wish to be involved in any legal complications in connection with the claims of the two agencies or their clients, and wish to do

all I can to save Cary harmless. Kindly let me hear from you at once, and oblige."

On April 15, 1916, Long wrote L. N. Cary, as follows: "You have doubtless been advised of the snarl that has developed in the attempted sale of my land during your absence in the south. Of course it was not my thought to give anyone the exclusive sale of it, and I assumed that whoever found a purchaser would first submit the matter to me. It seems, however, that your son thought that he had the right to close the deal. This was not my understanding, and the report of a sale by the other agent, Mr. Proudfoot, of this city, having reached me first, I felt, as a matter of fair play and business honor, that the land should go to his customer, although I much preferred from a personal standpoint to have it go to your customer. At any rate after executing the papers and forwarding them to the bank, it seems that all proceedings were stopped by the filing of a *lis pendens* by each party. Now I do wish that you would take the matter in personal charge, and see if you cannot have it fixed up some way so that all parties will be satisfied, without putting me to any further annoyance and expense. If you conclude that I must have an attorney to represent me, kindly advise me who will be a good man to look after my interests." Thereafter considerable correspondence followed between Long and Cary, and on June 26, 1916, Long conveyed the land to the plaintiff, Mrs. Boehm, for a consideration of $3,000.

A stipulation was entered into between the attorney representing Mrs. Boehm and the defendant, Long, and the attorneys representing Motsiff, that the court grant leave to said Motsiff to file his petition in intervention, "provided his complaint sets up a proper case for intervention, which question shall be tried out on demurrer to said complaint;" and that said petition in intervention be allowed to stand as a complaint in the said action against the plaintiff, Mrs. William Boehm, and the said defendant, Theodore K. Long, and that they have a period of thirty days in which to answer or demur to said petition in intervention.

The plaintiff and defendant demurred to the petition in intervention on the grounds: (1) That the intervener "had no interest in the matter in litigation, in the success of either party, or against both;" and (2) that said petition "does not state facts sufficient to constitute a cause of action against either plaintiff or defendant, or both of them." The

demurrer was overruled. The plaintiff and defendant thereupon inter-
posed separate answers to the petition in intervention. The answers,
aside from certain admissions, are in effect general denials, coupled
with the pleas on the part of Long of the pendency of the action brought
by Motsiff for specific performance; and the plea on the part of Mrs.
Boehm, that if the intervener has a contract for the purchase of the
land, she had no knowledge or information thereof "until long after
she had contracted for the purchase of said land from defendant." The
case was tried upon the issues framed by these pleadings, and as already
stated resulted in findings and judgment in favor of the intervener.

Appellants assign error upon the overruling of their demurrer to
the petition in intervention. It is contended that the action between the
plaintiff and defendant involved merely the respective rights and duties
of those two individuals under a certain contract, and that no one else
had any interest therein. Under the statute, "any person may before
the trial intervene in an action or proceeding, who has an interest in
the matter in litigation in the success of either party, or an interest
against both." Comp. Laws 1913, § 7413. The statute is not limited
to any particular class of actions or proceedings, but is general in its
application. While the rule of English chancery practice is that parties
to the contract, or those who have been substituted in their place on the
death of the original parties, on the conveyance of the land, or on the
assignment of the whole contract, are the only proper parties to a suit
for specific performance, the generally accepted rule in this country "is
that all persons who are interested in the enforcement of the contract
*must* be, and all those directly and specifically interested in the sub-
ject-matter *may* be, joined as parties to the suit for a specific perform-
ance."

Pomeroy, Spec. Perf. of Contr. 2d ed. pp. 546 et seq.; 36 Cyc. 767,
768; Pom. Eq. Jur. 3d ed. § 114; 20 R. C. L. pp. 684 et seq. In the
instant action the plaintiff, Mrs. Boehm, had received a conveyance
from Long before the petition in intervention was filed. The interests
of the plaintiff and defendant were the same. They both sought to at-
tain the same end, and by the express terms of their stipulation they
recognized the intervener as their joint antagonist. We have no hesi-
tancy in holding that Motsiff had "an interest in the matter in litiga-
tion" herein "against both" the plaintiff and defendant, and that the

trial court committed no error in holding that the petition in intervention presented a proper cause for intervention.

The correspondence and acts upon which the rights of the parties to this litigation are predicated have already been noted. We are entirely satisfied that the correspondence between Long and Cary upon which the plaintiff based her action for specific performance did not create any contract whatsoever. It is also clear that the conveyance which she obtained from Long is subject to all valid contract rights of the intervener, for when the plaintiff obtained the deed she had full knowledge of whatever rights the intervener had under his contract of purchase. Hence, the plaintiff obtained no greater rights as against the intervener than her grantor had. 36 Cyc. 761. See also § 7201, Comp. Laws 1913; Hunter v. Coe, 12 N. D. 505, 97 N. W. 869.

Appellants argue that the intervener has not established a contract of purchase. They say he has not shown the terms of payment, and that "it does not definitely appear what kind of notes and mortgage were contained in the proposition." In our opinion the argument is devoid of merit. In his letter to Proudfoot of January 31, 1916, Long quoted a price of $2,800 for the land. Proudfoot testified that the terms of payment were definitely agreed upon between himself and Long; but leaving such testimony wholly on one side, the terms of the sale are clearly established by the documentary evidence in the case. In the letter written by the First National Mank of Mandan, dated February 11, 1916, Long was fully advised of the terms on which Proudfoot had sold the land to Motsiff. In that letter Long was informed that Motsiff had deposited $500 in cash, and executed notes aggregating $2,300. The notes and mortgage securing the same were forwarded to Long in the letter. He made no objection whatever to the terms of payment; his sole objection was to the suggestion in the letter that he (Long) would be required to pay for the revenue stamps to be attached to the deed and for the abstract of title. The papers were again returned to Long on February 26, 1916, and in the letter accompanying them he was informed that the items of costs to the payment of which he had objected would be paid by the purchaser. After examining the papers he requested that certain changes be made in the notes. The changes were made, and so far as the intervener is concerned he complied with every request of Long. It is indeed difficult to understand how it can be

seriously contended that there was any uncertainty as to, or any failure of the minds to meet upon, the terms of payment.

Appellants also contend that the First National Bank of Mandan was not authorized to accept payment from Motsiff. The contention is untenable. An agent has authority to do everything necessary or proper and useful in the ordinary course of business for effecting the purpose of his agency. Comp. Laws 1913, § 6340. When Long transmitted the deed to the bank, and specifically constituted it his agent to deliver it to Motsiff, both Long and the bank knew all about how the purchase price was to be paid. They both knew that the bank had received from Motsiff, and was then holding, for Long $500 in cash. Long forwarded to the bank the notes representing the balance of the purchase price, with the request that certain changes be made therein. He said: "Please see that both makers are present and approve the change. Kindly return the notes when corrected." No other construction can reasonably be placed upon the correspondence, in view of the circumstances, than that Long expected the bank to receive and transmit to him the purchase price agreed upon.

We believe the intervener had and has an enforceable contract. He has paid the full purchase price agreed upon in the manner and to the person to whom Long intended and required it to be paid. There was nothing further for the intervener to do. He had done every act which he could, or was required to do, in order to complete the contract on his part. He certainly was not to blame for the failure or refusal of the bank (Long's agent) to deliver the deed. He was entitled to such delivery. If the deed had been delivered, and it and the mortgage recorded, such mortgage would have shown "on the abstract as the first lien on the land." "A lien is a charge imposed upon specific property by which it is made security for the performance of an act." Comp. Laws 1913, § 6699. When Long, in his letter to the bank, stated that the mortgage from Motsiff "must show on the abstract as the first lien on the land," he doubtless had in mind that there might be other liens created by or existing against Motsiff, and it was such liens that he wanted to guard against. It would be unreasonable to suppose that he had in mind any liens or claims that might be claimed against himself. The notice of *lis pendens* filed by the plaintiff did not create any lien, nor did it have any effect upon the obligations of the defendant. A no-

tice of *lis pendens* merely serves to give notice to subsequent purchasers or encumbrancers of the pendency of the action, so as to make the judgment therein binding upon such persons. Comp. Laws 1913, § 7425; Bouvier's Law Dict. Long's own contemporaneous construction of the transaction with Motsiff is quite illuminating. In his letter, dated March 23, 1916, Long expressly recognized that Proudfoot had made a "sale" of the land. And in his letter to Cary dated April 15, 1916, he says: "I felt as a matter of *fair play* and *business honor,* that the land should go to his [Proudfoot's] customer." This was Long's own construction of the deal and the rights of the intervener thereunder, although he admits "that both on account of the price and because of the old-time relationship" he would rather have the land go to Cary's customer. "Equity imputes an intention to fulfil an obligation," and "regards as done that which ought to be done." Our courts are open to administer "right and justice" (N. D. Const. § 22), and our laws do not permit one to "change his purpose to the injury of another." Comp. Laws 1913, § 7246. The judgment in this case meets with our entire approval. It awards to the intervener the land which he purchased and paid for. It also safeguards the rights of the plaintiff for the payments which she has made to the defendant.

Affirmed.